UNITED STATES of America,
Plaintiff-Appellee,

v.

Lawrence Everett ALLSTON,
Defendant-Appellant.

No. 79–2477

Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

March 14, 1980.

Glenn Zell, Atlanta, Ga., for defendant-appellant.

William F. Bartee, Jr., Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before GEE, HENDERSON and HATCHETT, Circuit Judges.

PER CURIAM:

Lawrence Everett Allston appeals from orders of the United States District Court for the Northern District of Georgia denying his Motion to Vacate Sentence filed pursuant to 28 U.S.C.A. § 2255. We affirm.

The appellant was convicted of the murder of Hector Aponte, an inmate at the United States Penitentiary at Atlanta, Georgia, and was sentenced to life imprisonment. This court affirmed the conviction and sentence without opinion. *United States v. Allston,* 526 F.2d 814 (5th Cir. 1976). Thereafter, the appellant filed the § 2255 motion which is the subject of this appeal, alleging improper use by the government of his post-arrest silence. He specifically complains of the following testimony elicited from him while on cross-examination:

Q. Okay. Now, let's back up. You say uncategorically that you told Mr. Clark that you had some witnesses; is that right?

A. It told him where I was and that he could check it out.

Q. Did you tell him who he could talk to to check it out?

* Fed.R.App.P. 34(a); 5th Cir. R. 18.

A. I told him I was with Mr. Monroe, he could—

Q. What about these other individuals that I just named, did you tell him about them?

A. No. But I told him that I was in that cell. He could have asked me who else was in there.

Q. Well, why didn't you volunteer?

A. Well, he asked me where I was at and who was I with, and I told him where I was at and who I was with.

Q. Do you recall the FBI coming to interview you?

A. Yes, I do.

Q. Do you recall what you told them?

A. I told them I didn't have anything to say because I would like to have a lawyer present.

Q. Okay, is that what you said, that you wanted a lawyer present?

A. I asked him about a lawyer. He read the rights.

Q. He read you your rights, I believe; is that correct?

A. That's correct.

Q. Isn't it a fact you just said to him you had something to say with regard to the Aponte matter and requested that the interview to be terminated?

A. He read me my rights. He asked me would I like a lawyer. I told him I would like to have a lawyer. The reason I told him that is because evidently I wasn't being believed, because I told Mr. Clark the situation, and I was still locked up.

Q. Well, why did you feel that you needed a lawyer?

A. Because I didn't feel that I was being believed.

Q. Okay. Now, was there any reason you didn't mention the witnesses to the FBI agent?

A. I didn't mention anything to them, just the fact I would like to have a lawyer.

Although the appellant raised no objection at trial, he now contends that this line of cross-examination was impermissible under the Supreme Court's holdings in *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), and *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, we agree with the district court's conclusion that this authority does not control in the instant case.

In *United States v. Hale, supra,* a defendant who attempted to establish an exculpatory story at trial was forced to admit on cross-examination that he did not offer the story to the police at the time of his arrest. The Supreme Court held, on evidentiary grounds, that the defendant's post-arrest silence should not have been admitted to impeach his testimony because the fact of silence was too ambiguous to be of significant probative value. The Court went a step further in *Doyle v. Ohio, supra,* and held that the State's use, for impeachment purposes, of the defendant's post-arrest silence after he had received the *Miranda* warnings violated the Due Process Clause of the Fourteenth Amendment. However, a footnote to the *Doyle* opinion makes the following distinction:

> It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.

426 U.S. at 619–20 n. 11, 96 S.Ct. at 2245 n. 11, 49 L.Ed.2d at 98 n. 11.

Here, the cross-examination of which the appellant complains was elicited in response to the following testimony on direct examination regarding his interview with a prison official:

Q. Have you ever been interviewed by any Government officer about this case?

A. I was interviewed by Lieutenant Clark.

Q. And can you remember approximately when that interview was?

A. It was, I think, maybe the 19th or 20th of June.

Q. All right.

A. In his office.

Q. All right. And when you gave that statement to Mr. Clark, is what you said today exactly what you told him?

A. Yes, sir, I told him I had no knowledge of this thing, and I told him where I was at the time.

Q. Did you tell him who you were with?

A. I told him who I was with. I told him to check it out.

Q. Okay, you told him, he could check it out?

A. Yes, I told him he could check it out.

Q. Did you tell him about your relationship with Aponte?

A. Yes. He asked me how did Mr. Aponte—how did I get along with him, and I told him I got along with him well, as well as anyone in the cell.

It is apparent from this testimony that the appellant desired to create the impression that he had cooperated fully in the government's investigation of the crime. Thus, this case represents one of the exceptions noted in *Doyle* where the prosecution is entitled to use the defendant's post-arrest silence to impeach his testimony as to his behavior following arrest. Furthermore, in *United States v. Fairchild,* 505 F.2d 1378 (5th Cir. 1975), cited in the above *Doyle* footnote, this court held under similar circumstances that a defendant who raised the issue of his cooperation with the authorities "opened the door" to a full development of that subject. As we noted in *Fairchild,* "[a]ssuming the law would have excluded from evidence [the defendant's] silence had he not broached the subject of cooperation, once he did broach it the bar was lowered and he discarded the shield which the law had created to protect him." *Id.* at 1383. *See also United States v. Ahrenholz,* 569 F.2d 420 (5th Cir. 1978); *United States v.*

*Blalock,* 564 F.2d 1180 (5th Cir. 1977); *Stone v. Estelle,* 556 F.2d 1242 (5th Cir. 1977), *cert. denied,* 434 U.S. 1019, 98 S.Ct. 742, 54 L.Ed.2d 767 (1978); *United States v. Griffin,* 530 F.2d 101 (5th Cir. 1976). Consequently, the district court was correct in ruling that the appellant had "opened the door" to the cross-examination on the issue of his post-arrest silence, and his motion was properly denied on this ground.

■ The appellant also asserts that the government made impermissible use of his post-arrest silence during closing argument. He directs our attention to the following comments of the prosecuting attorney:

Ask yourself this question: Why did Mr. Allston fail to come forth and tell the government or the prison officials, after he had been in segregation for a year, Well, loo[k], fellow, I was in this cell studying the Koran. I have this witness and this witness who saw me. He didn't do that.

You're not supposed to leave your common sense outside the jury room. [What] would you have done if you were in that situation? If you had people who knew [where] you were at a given time, would you wait for a year to [come] forward with it? Would you wait until the trial? Ask yourself that question.

The district court concluded that these comments, although they would not have been error had they been confined to an argument on credibility, did constitute error in that the prosecutor attempted to use the appellant's silence as an indicia of guilt. *See United States v. Edwards,* 576 F.2d 1152 (5th Cir. 1978). The court further determined that the error could not be characterized as harmless because the government's case was not overwhelming and the appellant's alibi testimony was not totally implausible. *See Chapman v. United States,* 547 F.2d 1240 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977). However, since the appellant failed to object to the prosecutor's argument at the trial, the district court went on to apply the plain error rule. The court reasoned that, due to the fact that the evidence of silence had already been properly admitted

for impeachment purposes, and since the improper remarks did occur in the context of a discussion of credibility,[1] no plain error was committed. The district court's conclusion is again amply supported by our decision in *United States v. Fairchild, supra.* Here, as in *Fairchild,*[2] the prosecutor's comments were somewhat ambiguous in the context in which they were made, and a "lingering fragrance of rebuttal" remained. 505 F.2d at 1384 n. 9. Therefore, the district court correctly concluded that the prosecutor's argument did not constitute plain error. The judgment denying the appellant's Motion to Vacate Sentence is

AFFIRMED.

---

1. The objectionable remarks occurred during the following portion of the prosecutor's argument:

Now, ladies and gentlemen, you can't go into a cell three ways unless you're making it up. Now, I think there's a difference between observing something and doing something. When you do something, you know what it is you participated in. You don't have the same memory lapse, perhaps, as in observing something, so you're not going to get three different stories, entering a cell, particularly when you were arrested for it. I think that's going to stick with you.

Now, I'm about to sit down. But before I do, I'd like to leave you with something to think about. When the defense witnesses come up, and these are going to be some questions that apply to everybody, the first question I have that I want you to think about, when Mr. Allston's lawyer comes up, is how is it he failed to discover the fact of the murder until the next day, when he lived with Mr. Aponte? You consider that with the other testimony in this case, and you keep that in your mind when his lawyer comes up to talk to you. Ask yourself this question: Why did Mr. Allston have to go out and find witnesses he already knew?

*Ask yourself this question: Why did Mr. Allston fail to come forth and tell the government or the prison officials, after he had been in segregation for a year, Well, loo[k], fellow, I was in this cell studying the Koran. I have this witness and this witness who saw me. He didn't do that.*

*You're not supposed to leave your common sense outside the jury room. What would*

*you have done if you were in that situation? If you had people who knew where you were at a given time, would you wait for a year to come forward with it? Would you wait until the trial? Ask yourselves that question.*

Finally, ask yourselves what hard evidence is there to indicate either Mr. Driggers or Mr. Colon were given any consideration for their testimony? Mr. Driggers told you he wasn't. He told you this was his first prison sentence and he was convicted of bank larceny. He started his papers up long before this.

But when the defense starts talking about it, what is the hard evidence to show otherwise? Ask yourselves that.

The next question is addressed to Mr. Monroe. When Mr. Monroe's attorney comes up, ask him, or think to yourself, why did Mr. Monroe have to go out and find witnesses who lived with him, people who had lived with him for some time, but he had to go out and find witnesses.

2. Fairchild complained of the following comment:

But one thing is for sure, Mr. Alton Robert Fairchild wouldn't say a thing. He was confronted right out there with this proposition . . . . He was confronted right out there with the proposition that nothing matches up—silence. He wouldn't even tell them where he lived. They had to drag it out of him. Now, why is that? It's because he knew what was going on, ladies and gentlemen.